SCHIFF HARDIN LLP
BRUCE A. WAGMAN (*Pro Hac Vice* Application Forthcoming)
bwagman@schiffhardin.com
ROBERT G. ENGEL (OSB # 01176)(Federal Court Admission
Application Forthcoming)
rengel@schiffhardin.com
One Market, Spear Street Tower, 32nd Floor
San Francisco, CA 94105
Telephone:   (415) 901-8700
Facsimile:   (415) 901-8701

HARRANG LONG GARY RUDNICK P.C.
CRAIG J. CAPON (OSB # 98192)
craig.j.capon@harrang.com
360 E. 10th Avenue, Suite 300
Eugene, OR 97401-3273
Telephone:   (541) 485-0220
Facsimile:   (541) 686-6564

Of Attorneys for Plaintiffs

FILED '07 JUN 25 11:51 USDC-ORE

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **CHIMPS, INC., INTERNATIONAL PRIMATE PROTECTION LEAGUE, and MARGUERITE GORDON,**<br><br>Plaintiffs,<br><br>v.<br><br>**PRIMARILY PRIMATES, INC.,**<br><br>Defendant. | Case No.: 07-6149-HO<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT, QUANTUM MERUIT AND LIEN FOR SERVICES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Chimps, Inc., International Primate Protection League, and Marguerite Gordon (collectively "plaintiffs") file this, their Complaint for declaratory relief, quantum meruit, and a lien for services against Defendant Primarily Primates, Inc. ("Defendant"), and allege as follows:

## I.    INTRODUCTION

1.    Plaintiffs Chimps, Inc. and International Primate Protection League are animal sanctuaries whose main purposes are to rescue, rehabilitate, and permanently

600002357

retire animals who are neglected, abused or discarded by others, and to provide conservation education and protection throughout the world. Plaintiff Marguerite Gordon has devoted her life to animal protection. Each plaintiff is dedicated to these missions and is also involved in educating the public about the animals whose lives they have saved. The sanctuaries, as a rule, take in animals for whom they will provide care until the animals naturally expire.

2.      Between November 2006 and April 2007, plaintiffs agreed to provide lifetime care for two young chimpanzees, twelve gibbons, and a longhorn steer – all of whom had been discovered in states of severe neglect and abuse at Primarily Primates, Inc. ("PPI"), in San Antonio, Texas. In November 2006, PPI had over 700 animals who were living in filth, deprived of most contact and interaction, undernourished and, in many cases, in very bad health and various states of suffering. Their afflictions were the result of absent or appalling care, as well as woefully inadequate and inappropriate housing which caused their problems.

3.      Plaintiffs were identified as potential adopters of the animals because of their willingness to provide lasting homes and superior care to these animals.

4.      PPI is a public charity and under Texas law its assets are held in trust for the citizens of Texas. Plaintiffs were contacted by a court-appointed Receiver who had been put in charge of the animals and the assets at PPI by a Texas probate judge. The Receiver was appointed in response to a request by the Texas Attorney General, who filed a thirty-three-page complaint alleging misappropriation of charitable funds, animal cruelty and neglect, public endangerment, unlawful possession of dangerous wild animals and multiple environmental violations.

5.      Because of years of pervasive disregard of every aspect of animal health and safety, hundreds of animals found at PPI had been barely existing in desperate and life-threatening conditions. Some had to be euthanized because they were in such terrible states. The lack of sanitation at PPI – which included large standing pools and

"rivers" of animal excrement on the property, and mounds of dead animals' bodies – also caused significant human health and safety issues, as well as significant environmental hazards. PPI's principals were also accused of fraud and flagrant misuse of public funds.

6.      The Receiver was directed to, and did, act in the best interests of the animals. Based on the recommendations of veterinarians and animal care professionals, the Receiver had a small number of those transferred to plaintiffs' facilities. Plaintiffs agreed to take these animals for the dual purpose of improving their health and providing them with permanent homes to live out the rest of their lives. In order to allow all PPI funds to be used for the care of the animals, plaintiffs agreed to provide for the one-way transport of the animals to their new homes.

7.      The animals received by plaintiffs were all in great decline. They were in states of malnutrition, stress, and disease, and at PPI they had been living in cages that were unsafe for both the animals and their caretakers. The animals exhibited signs of both physical and psychological detriment from extended periods in the unsanitary and harmful conditions at PPI, without sufficient care.

8.      PPI presented a clear picture of severe "animal hoarding," which occurs when animals are warehoused without concern for their health or well-being, and when the individuals holding them deny the severity of problems the animals experience. Animal hoarding is a frequent cause of suffering of large groups of animals, like those at PPI. PPI's conduct was consistent with an identified trend where status as a "sanctuary" or "rescue" is used as a defense or cover for abusive hoarding behavior.

9.      At plaintiffs' sanctuaries, each animal removed from PPI has been provided with professional caretakers and, where necessary, extensive veterinary care. Each animal has improved and learned to adapt to his or her new home, where s/he has been provided attention and affection and high-quality housing and nutrition.

Plaintiffs have spent tens of thousands of dollars on these animals for housing, transport, veterinary care and daily maintenance.

10.     PPI still has roughly 500 animals, for whom plaintiffs are informed and believe PPI still cannot properly care, and who still live in substandard conditions and receive inadequate care.

11.     Plaintiffs entered into written agreements with the court-appointed Receiver for the transfer of the animals. By operation of the written agreements and prior court orders, plaintiffs now have permanent possession of the animals at issue, and PPI has absolutely no right or interest in these animals. The agreements do not include a provision for return of the animals to PPI. Nevertheless, PPI has now begun to harass plaintiffs with claims that plaintiffs must return the animals, supposedly pursuant to the animal transfer agreements. Plaintiffs now perceive a new threat to the health and safety of the rescued animals from PPI. Thus, a dispute exists between the parties relating to their rights and obligations with respect to the animals, and plaintiffs are forced to seek a determination and declaration of their rights pursuant to those agreements and applicable law.

12.     PPI is now demanding that plaintiffs return the animals whom the sanctuaries have rescued. The physical and psychological injuries of the adopted animals are just beginning to heal, and they are recovering from the illnesses they had at PPI. Yet Defendant is seeking to subject these animals to the traumatic experience of another transfer, a return to the same site and an environment of suffering like that the animals fortunately escaped when plaintiffs agreed to accept them into their sanctuaries for lifetime care.

13.     In the event the Court determines that any of the animals must return to PPI, the law requires that PPI compensate the sanctuaries for the amount spent in connection with the transport and care of the animals.

## II. PARTIES

14.     Chimps, Inc. is an Oregon nonprofit corporation, with its principal place of business in Bend, Oregon. Its primary mission is to provide lifetime care and protection to chimpanzees and big cats in need of permanent homes and to educate the public about chimpanzee conservation. Chimps, Inc. agreed to adopt two of the chimpanzees at PPI, Emma and Jackson.

15.     International Primate Protection League ("IPPL") is a California corporation with its principal place of business in Summerville, South Carolina. IPPL agreed to rehabilitate twelve of the gibbons at PPI when called upon to help. IPPL has been a recognized leader in primate care and protection for thirty-four years. It has field representatives in thirty-one countries, and its main sanctuary is in South Carolina, where IPPL has built a habitat and enclosures for its animals that provides for all their needs in the best possible fashion. It is considered an international leader in the housing and care of gibbons – highly endangered arboreal apes native to the tropical forests of Southeast Asia.

16.     Marguerite Gordon is, and at all relevant times has been, a resident of New Mexico.

17.     Defendant PPI is a Texas corporation with its principal place of business in San Antonio, Texas.

## III. JURISDICTION AND VENUE

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. section 1332(a)(1) and 28 U.S.C. section 2201(a), because complete diversity exists between plaintiffs and defendants, and the amount in controversy exceeds $75,000, and there exists a dispute between the parties with respect to written agreements and applicable law.

19.     Venue is proper in this Court pursuant to 28 U.S.C. section 1391(a)(2) because contracting party-plaintiff Chimps, Inc. is located in Bend, Oregon, and the

chimpanzees for whom Chimps, Inc. agreed to provide lifetime care are also in Bend, Oregon.

## IV.  **FACTUAL BACKGROUND**

20.    In January 2006, PPI had over 700 animals, most of them nonhuman primates, approximately seventy-five of them chimpanzees, living in abusive, substandard and dangerous conditions.

21.    According to one expert who runs a primate sanctuary and who visited PPI in 2003, PPI's financial situation in 2006 presented "a bleak picture of an organization in a downward spiral." Public support had drastically declined, while PPI continued to increase the number of animals onsite, through "unplanned births, animal purchases, and new intakes."

22.    Many of the animals at PPI are held in violation of Texas law. That is, PPI operates in violation of Texas Health and Safety Code section 822.101 *et seq.* which, *inter alia*, makes it a misdemeanor to transfer ownership of a "dangerous wild animal," which includes chimpanzees. Texas Health and Safety Code sections 822.113(b), 822.101(4)(Q). In addition, the county in which PPI operates has, pursuant to the state statutory scheme, "prohibit[ed] the keeping of a dangerous wild animal." PPI does not qualify for any applicable exemptions.

23.    Over sixty chimpanzees still live at PPI today.

24.    Despite the dire state of animal welfare and the wasting of public assets, in January 2006 PPI entered into an agreement to care for nine additional chimpanzees and three capuchin monkeys. It was paid approximately $236,000 to provide long-term care for these primates.

25.    The estimated cost of care for a captive chimpanzee for a single year is $10,000. Chimpanzees can live to be sixty years old in captivity.

26.    In March 2006, these nine chimpanzees and three capuchin monkeys were transported to PPI. PPI, despite being responsible for the care of over sixty

chimpanzees at the time, was completely unequipped to facilitate a safe and routine transfer of the chimpanzees. PPI was unable to obtain the services of a veterinarian – necessary to accomplish a successful transfer from the transport trucks – for over twenty-four hours after the chimpanzees' arrival.

27.     As a result of PPI's inability to perform the transfer, one of the chimpanzees, Kermit, died – after sitting in his transport truck for a day while PPI was attempting to arrange for his transfer. Several weeks later, another one of these chimpanzees, Bobby, was dead of health complications. Additionally, one of the monkeys from this group escaped – just after transfer – through a hole in a fence. Plaintiffs are informed and believe that monkey has never been found.

28.     In all, over the course of three months in 2006, five chimpanzees died at PPI.

29.     Veterinary and animal care experts confirmed, in July 2006, that PPI could not even meet the health and psychological needs of the nine chimpanzees it was seeking to add to its collection of over sixty. This clearly indicates PPI was unable to care for the over seventy chimpanzees it then had, nor the 600 hundred other animals who already lived on site.

30.     Unacceptable and dangerous housing was a hallmark of the wretched state of PPI's affairs. Caging for all animals, and especially primates, is crucial to their health and well-being. The housing at PPI was notably deficient, and a cause of its problems, because of the structure, size, and design, as well as the fact that there were simply far too many animals for the space available. A permanent, and drastic, reduction in the number of animals was recommended by every professional who evaluated the situation.

31.     A primate veterinarian who visited PPI also noted the total lack of psychological stimulation provided for the animals. Primatologists agree that the provision of this "enrichment" is absolutely necessary for the health of primates, to

prevent them from developing severe long-term mental illness. Primates without enrichment develop psychoneurosis or neurotic disorders that create physical abnormalities, make them unable to interact with other chimpanzees, and create chronic emotional problems. In short, abandoning any primate to a cage without stimulation – which was standard procedure at PPI – is a form of significant neglect and abuse.

32. Chimpanzee brains and emotions mirror those of humans in many ways. In fact, chimpanzees share approximately 98.4 per cent of the genetic makeup of humans, and chimpanzees have the intellectual capacity of a three- to four-year-old human child. They suffer emotional and physical pain "just as we do and often for the same reasons." Roger Fouts, *On the Psychological Well-Being of Chimpanzees*, 1 Journal of Applied Animal Welfare Science 65 ("Psychological Well-Being of Chimpanzees"), 69 (1998). Indeed, chimpanzees engage in higher level cognitive behavior, including rational and conceptual thought, problem-solving, creative thinking and strategizing. *See, e.g.,* S. Savage-Rumbaugh, D. Rumbaugh and Boysen, *Symbolic communication between two chimpanzees (pan troglydytes )*, Science 201, 641-44 (1978); B.T. Gardner & R.A. Gardner, *Two-Way Communication with an Infant Chimpanzee*, Behavior of Nonhuman Primates, Vol. 4 (1971).

33. When faced with abuse and neglect, chimpanzees respond like humans subjected to similar situations. They cry and scream and utter sounds with distinct meanings. Jane Goodall, *The Chimpanzees of Gombe: Patterns of Behavior* 125 (1986). They are aware of themselves and others as distinct individuals. R. Fouts and S.T. Mills, *Next of Kin* ("*Next of Kin*") 155 (1997) (chimpanzees express understanding of humans' distress, physical pain and anger); J. van Hooff, *Understanding Chimpanzees* 276-84 (1994). Their social relations with one another and with humans are wide-ranging and complex. William Karesh, *Appointment at the Ends of the World: Memoirs of a Wildlife Veterinarian* 299 (1999); Psychological Well-Being of Chimpanzees, 69.

34.    It is a universally-accepted fact that "chimpanzees have emotions similar to those which in ourselves we label pleasure, joy, sorrow, boredom and so on." *See* Goodall, p. 118; *see also Next of Kin* 155 (chimpanzees expressing sadness, pleasure). Thus, when they are neglected and provided with no outlet for their intellect and intelligence, they suffer emotional distress and psychological harm.

35.    The problems observed at PPI, by veterinary experts and then by a court-appointed special master in an earlier lawsuit, included: (1) contagious diseases; (2) lack or absence of sanitation; (3) inadequate and untrained staff; and (4) absence of enrichment to stimulate the intellect of the chimpanzees. PPI was characterized as "no better than a warehouse to hold these animals until they die."

36.    A nationally-renowned veterinarian, who is also an animal cruelty investigator and expert on animal hoarding, reviewed the evidence regarding PPI and submitted an affidavit with respect to her findings. She concluded that PPI was a facility where hoarding is occurring, to the death or detriment of hundreds of animals. She stated that hoarding conditions always get progressively worse without intervention. A nonexhaustive summary of the problems she noted includes:

   a.   Unacceptable and insufficient ratio of staff to animals at PPI;

   b.   Nonexistent health care of any sort (preventative or care of sick or injured animals);

   c.   PPI had no staff veterinarians, demonstrating its unwillingness to care for the animals in its possession;

   d.   Lack of stimulation and enrichment for the primates and a filthy, toxic environment for all the animals;

   e.   Infestation by opportunistic vermin, and barren, hazardous cages and enclosures;

   f.   Dangerously close proximity of PPI to neighborhood children and homes, emphasizing the peril that the entire community is in because of the unfortunate events occurring daily at PPI;

g.      Ongoing, chronic animal waste problem, with large open cesspools which present threats to the animals, their human caretakers, neighbors, and the community at large;

h.      Absent or inadequate recordkeeping and chronic neglect;

i.      Expending large sums of money to increase the number of animals at PPI despite the lack of care for existing animals; and

j.      Inadequate, unsafe and unhealthy housing.

37.      In October 2006, the Texas Attorney General filed an action against PPI, which included allegations that

a.      PPI allowed animals (including chimpanzees and monkeys) to escape their enclosures, and violated state law by failing to report escapes or recapture animals, and failed to take remedial action to prevent future escapes;

b.      Human and animal health is at risk at PPI because of standing, untreated raw sewage on the property, percolating into the groundwater and running off into a local creek and water supply;

c.      Woefully inadequate veterinary care places the public and the resident animals at great risk of diseases, including hepatitis and tuberculosis;

d.      PPI exhibits clear signs of animal hoarding phenomenon;

e.      Animals are kept in cruel and overcrowded confinement and in distressingly inadequate shelter; and

f.      PPI failed to provide the nonhuman primates with any psychological enrichment or physical activity consistent with the Animal Welfare Act.

38.      Based on the egregious conditions at PPI, the court appointed a Receiver, Lee Theisen-Watt, who was given the authority "to undertake actions she deems to be in the best interests of the animals" including transfer, removal and euthanasia of the animals on the premises.

39.      Ms. Theisen-Watt was also given authority to control and oversee all financial aspects of PPI, hire experts and attorneys, and direct PPI's legal affairs.

     COMPLAINT FOR DECLARATORY JUDGMENT, QUANTUM MERUIT AND LIEN FOR SERVICES

40.     The receivership was in place from October 2006 until May 2007, at which time the Attorney General's action was dismissed pursuant to a settlement between the Attorney General and PPI.  As part of the settlement, the Attorney General retained inspection oversight, and the right to receive minutes of the PPI Board of Directors meetings.

41.     During the course of the receivership, volunteers and staff worked on a daily basis to try to remedy some of the worst problems at PPI.  The number of animals at PPI, along with the overwhelming task of rehabilitating them and the unhealthy environment, made the task very difficult.  While some progress was made, plaintiffs are informed and believe that PPI remains an unsuitable environment for humans and animals alike, because it suffers from systemic deficiencies and lack of critical infrastructure.

42.     In order to reduce the number of animals so that better care could be provided, and so that the problems caused directly by overcrowding would be reduced, the Receiver worked with veterinarians and experienced animal care personnel in evaluating animals who were most appropriate for transfer.  The Receiver endeavored to find quality homes for the animals who could be transferred based on the superiority of their new habitats and the likelihood that they would be able to make a successful transition and improve their health.

43.     A number of animal sanctuaries around the country, including the plaintiffs in this action, volunteered to provide permanent homes and lifetime care for the animals.  Each plaintiff agreed to provide for the transport to their facility, based on an understanding that the animals in question would never have to leave their new homes.

44.     Each plaintiff in this action operates a sanctuary setting where animals who have been abused, neglected or abandoned can be permanently "retired" to live out their lives without exposure to mistreatment and in settings where they are provided exemplary care and comfort.

COMPLAINT FOR DECLARATORY JUDGMENT, QUANTUM MERUIT AND LIEN FOR SERVICES

45.     Each plaintiff in this action paid for the costly transport of the animals they rescued from PPI, and each plaintiff has provided all veterinary and daily care to these animals. These amounts have been substantial and detailed accountings can be provided to the Court upon request.

46.     Emma and Jackson are the two young chimpanzees who were rescued by Chimps, Inc., from a life of physical neglect, as well as emotional and psychological trauma at PPI. Chimps, Inc. personnel visited Emma and Jackson three times prior to transfer to the Chimps, Inc. facility in Bend, Oregon. On all three occasions the chimpanzees exhibited signs of substantial psychological distress.

47.     During her time at PPI, Emma had several bouts of severe systemic illness, and animal care personnel at PPI were very concerned that she would not survive those incidents. Jackson had at least two documented escapes from his cage.

48.     Chimpanzees are highly social animals who need near-constant attention from caretakers, as well as interactions with multiple members of their own species. This is especially true of young chimpanzees like Emma and Jackson, who are harmed when subjected to the type of deprivation they experienced at PPI. At PPI, Emma and Jackson were isolated in severely inadequate housing and deprived of any contact with other chimpanzees.

49.     Young chimpanzees like Emma and Jackson cannot properly develop (socially, behaviorally or physically) without a maternal influence. Emma and Jackson were denied any such contact or connection at PPI.

50.     At Chimps, Inc., Emma and Jackson have been incorporated into a cohesive group of chimpanzees, with whom they always have contact, with appropriate mother figures.

51.     When Chimps, Inc. agreed to take Emma and Jackson, the chimpanzees were exhibiting significant signs of chronic deprivation, and Emma had been close to death on multiple occasions. If they had not been rescued, the chimpanzees' conditions

COMPLAINT FOR DECLARATORY JUDGMENT, QUANTUM MERUIT AND LIEN FOR SERVICES

would have certainly deteriorated even further. It was Chimps, Inc.'s expectation and intent in entering into the Animal Transfer Agreement that Emma and Jackson were coming to Chimps, Inc. for the rest of their lives.

52.     Since being at Chimps, Inc., Emma and Jackson have been cared for by Chimps, Inc.'s veterinary and professional staff, as well as a primate behaviorist specially brought in to assist in the difficult adjustment period.

53.     At PPI there was an estimated 1:114 staff:animal ratio for over 700 animals. At Chimps, Inc. there are four trained animal care staff and two volunteers/interns for the ten animals there, or just slightly greater than a 1:1 staff:animal ratio.

54.     At Chimps, Inc., Emma and Jackson receive regular veterinary examinations and both are in good health.

55.     In contrast to their sensory and social deprivation at PPI, at Chimps, Inc. Emma and Jackson have been successfully incorporated into a large family unit so that they can socialize and learn healthy and normal captive chimpanzee behaviors.

56.     At Chimps, Inc., these young chimpanzees have constant access to thousands of square feet of enclosures, with ample enrichment, and an outdoor habitat to explore at any time. This is in stark contrast to the smaller, barren cages they lived in at PPI, which they could not leave.

57.     Transport is very stressful to chimpanzees. They often must be sedated, and there is a potential of illness, injury or even death during transport. Chimpanzees being transported are placed in unfamiliar surroundings, are exposed to unexpected and frightening noises and movements, and experience variables in light, heat, humidity and pressure that may cause varying degrees of distress. Stress-induced diarrhea and secondary dehydration is a common consequence of transport – one that Emma suffered.

58. If Emma and Jackson were returned to PPI, they would suffer extreme stress and anxiety from the transfer alone. The transfer itself could return them to an unhealthy and impaired condition similar to what existed upon their removal from PPI. Additionally, they have developed strong family bonds at Chimps, Inc., which would be destroyed – this would also cause severe psychological damage to Emma and Jackson, as well as their group members at Chimps, Inc.

59. If Emma and Jackson were forced to return to PPI, where they were subjected to years of neglect and abuse, they would show signs of trauma similar to those of a child being forced to return to an abuse situation. Because chimpanzees have the intellect of young children, this effect would be significant and severe.

60. International Primate Protection League ("IPPL") was contacted about the plight of the gibbons living at PPI. Gibbons normally live in tropical temperatures high in the rainforest. At PPI, the gibbons were left outside in the Texas ice storms. Icicles grew on their coats because of the inadequate care and housing at PPI. IPPL volunteered to take care of the gibbons and provide them with a life integrated into the gibbon community in South Carolina, where they would have a living environment that protected them from the elements and provided them with a family group where appropriate.

61. The gibbons rescued from PPI were given veterinary examinations prior to leaving PPI which demonstrated blood tests with some problems. Several of the gibbons were extremely thin. Most of the gibbons had no medical records, and six had no files at all.

62. The major species of animal that IPPL cares for are gibbons. It was IPPL's expectation and intent in entering into the Animal Transfer Agreement that the gibbons were coming to IPPL for the rest of their lives.

63. At IPPL, the gibbons have been cared for by four full-time and two part-time caregivers, and closely observed. They have large, heated indoor units, play

equipment, and air conditioning if needed. The diet they are fed at IPPL is in marked contrast to what they received at PPI.

64.     Gibbons generally live in monogamous pairs. Returning the gibbons to PPI would likely cause them to become depressed. The staff:animal ratio, and the level of expertise in caring for gibbons, are much greater at IPPL, as compared to PPI.

65.     One of the most characteristic and important behaviors of gibbons are their songs, or calls. Gibbons have complex songs which represent their communication with each other and their environment. These songs are rich in detail and vary between ages, species, genders, and activities.

66.     At PPI, the gibbons' songs were absent or stunted and notably aberrant. This indicated stress and abnormal behavior. At IPPL, the gibbons have returned to full and appropriate songs typical of their gender and subspecies.

67.     Marguerite Gordon was contacted by the Receiver and was asked if she would be willing to rescue four bovines from PPI, because of the lack of care and inadequate nutrition they were receiving. Ms. Gordon was asked to provide lifetime care for these four animals. She intended to take care of them until they died, when she entered into the Animal Transfer Agreement.

68.     Ms. Gordon only received one bovine, a longhorn steer. When he was removed from PPI he was partially lame, dangerously underweight, and had a dull coat. He has been placed in a rich, 300-acre pasture environment with a herd of cattle. His limp has vastly improved, he has returned to a healthy weight, and his coat shines and is healthy-looking.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Declaratory Judgment (28 U.S.C. § 2201(a))

69.     Plaintiffs incorporate by reference every prior paragraph of this complaint.

70.     Chimps, Inc. entered into an Animal Transfer Agreement with the Receiver on March 12, 2007, in connection with Chimps, Inc.'s adoption and transfer of Emma and Jackson to its facility in Bend, Oregon. A true copy of that Agreement is attached as Exhibit A.

71.     IPPL entered into an Animal Transfer Agreement with the Receiver on March 30, 2007, in connection with its adoption and transfer of twelve gibbons, so that IPPL could begin the rehabilitation of the gibbons rescued from PPI. A true copy of that Agreement is attached as Exhibit B.

72.     Marguerite Gordon entered into an Animal Transfer Agreement with the Receiver on April 18, 2007, which allowed Ms. Gordon to transfer and begin the rehabilitation of the longhorn steer rescued from PPI. Although this Agreement describes four bovines, Ms. Gordon only received one. A true copy of that Agreement is attached as Exhibit C.

73.     The Animal Transfer Agreements cite two orders by the Texas courts which provide that the Receiver can make decisions "she deems to be in the best interests of the animals" at PPI.

74.     Plaintiffs were chosen to receive the animals in question because it was determined, on the advice of professional healthcare personnel, that it was in the best interests of the animals to transfer them to plaintiffs.

75.     The Animal Transfer Agreements state that Chimps, Inc. and IPPL each operate a "nonprofit sanctuary dedicated to providing lifetime care for retired chimpanzees [and gibbons that is] designed to nurture and stimulate these sensitive and complex primates by creating a secure and enriching environment...."

76.     The Animal Transfer Agreements unequivocally state that the plaintiffs had already agreed to "provide permanent care and lifetime sanctuary" to the animals at the time they entered into the Agreements. The parties' intent in entering into the

Agreements was that plaintiffs had entered into a contract to provide permanent, lifetime care.

77.     At no time did the contracting parties contemplate that the subject animals would be returned to PPI under the Animal Transfer Agreements.

78.     The Animal Transfer Agreements provide that the plaintiffs agree to "temporary" custody and plaintiffs understood that they would ultimately be granted permanent custody of the animals, as outlined in the Agreements. By operation of law, plaintiffs were subsequently granted permanent custody of the animals.

79.     The Animal Transfer Agreements provide that plaintiffs would provide transportation in only one direction, which they have done. The absence of any provision for a return transport indicates the contracting parties did not intend to have the animals returned at any time. Since the only provision for transfer in the Agreement required the receiving party to provide for transfer, any party receiving the animals in the future would be responsible for the cost of that transfer.

80.     The Animal Transfer Agreement cannot be construed to require a return of the animals to PPI as such a provision would be void as against public policy for multiple reasons including, but not limited to,

     a.     If plaintiffs return the animals they could be accused of committing a crime in violation of animal cruelty laws;

     b.     A contract cannot be made for the commission of a criminal act;

     c.     If plaintiffs return the animals they could be accused of committing illegal acts including endangerment of the public based on the conditions at PPI;

     d.     If plaintiffs return the animals they could be accused of committing a violation of the Animal Welfare Act which is incorporated into the Agreements;

     e.     If Chimps, Inc. returns Emma and Jackson it will be in violation of the Texas and Bexar County laws regarding dangerous and wild animals; and

f.          PPI has several unremediated serious environmental violations, increasing the chance of danger to the animals and humans by any increase in the number of animals already at PPI.

81.     The Animal Transfer Agreement cannot be construed to require a return of the animals upon demand by PPI, because PPI has no right to make such a demand. The State of Texas previously owned the animals, because PPI is a public charity holding assets in trust for the State of Texas. Currently, only plaintiffs have the right to possess the animals, and PPI has waived its right to make any demand on plaintiffs.

82.     The Animal Transfer Agreement cannot be construed to include a return of the animals to PPI since the purpose of the Agreement was to provide for the best interests of the animals, which would not be favored by a return, because of (a) the conditions at PPI; (b) the inability of PPI to care for these animals; (c) the trauma of removal from the sanctuaries in which the animals now live; (d) the potential danger, including death, of transfer of the animals; and (e) the stress and terror the animals would undergo if they were forced to return to the facility where they were abused and neglected for so long.

83.     Plaintiffs are required to provide "complete and competent care, including housing, feeding, cleaning and medical care" to the animals they have received. This could not be accomplished at PPI, and plaintiffs would be in breach of the agreement if they participated in a return of the animals.

84.     PPI has written letters to plaintiffs demanding return of the animals at issue, despite its lack of legal authority to do so.

85.     PPI has asserted its incorrect position that the Animal Transfer Agreements require plaintiffs to return the animals to PPI upon demand. This position is in direct contrast with the spirit and intent of the Agreements and applicable law. PPI has sent letters, made telephone calls, and sent electronic mails to plaintiffs and their

representatives, consistently asserting this demand and supposed right under the Agreements.

86. PPI has, in written and oral communications, threatened litigation against these plaintiffs and others with similar Agreements.

87. Plaintiffs and PPI have an active dispute based on the interpretation of the Animal Transfer Agreements, and plaintiffs request that this Court issue a judgment declaring the rights and obligations of the parties under the Animal Transfer Agreements and applicable law.

## SECOND CAUSE OF ACTION

### Quantum Meruit

88. Plaintiffs incorporate by reference every prior paragraph of this complaint.

89. Plaintiffs conferred a benefit on PPI by transferring, removing, rescuing, rehabilitating, and caring for the animals in question.

90. Care for any animal is expensive, and the care for the chimpanzees and gibbons has been especially expensive because of their problematic health conditions when they left PPI.

91. PPI was at all times aware of the benefits of removal of the animals, veterinary and other care, good nutrition, and good housing.

92. If PPI comes into possession of the animals at any time in the future, it would be unjust to allow it to keep the substantial benefit provided by plaintiffs without paying for that substantial benefit.

93. While the Agreements between plaintiffs and the Receiver do not contemplate a return of the animals, and while PPI has no right to seek or obtain recovery of the animals, if for any reason the animals were delivered to PPI, PPI is responsible for quantum meruit payment in an amount to be determined by proof, including all costs of transfer of the animals.

///

## THIRD CAUSE OF ACTION

### Lien for Services

94.     Plaintiffs incorporate by reference every prior paragraph of this complaint.

95.     While the Agreements between plaintiffs and the Receiver do not contemplate a return of the animals, and while PPI has no right to seek or obtain recovery of the animals, if for any reason the animals were returned to PPI, plaintiffs assert a lien under applicable law for the cost of transfer, care, and maintenance of the animals.

96.     Plaintiffs are currently in possession of the animals in question and believe there is no construction of the Animal Transfer Agreements or applicable law that requires them to release the animals.

97.     Plaintiffs intend to care for the animals for their entire lives, but if they are ever returned to PPI, plaintiffs will assert a lien for transfer, rescue, care and other services provided, since plaintiffs were specifically requested by the Receiver to fulfill those obligations.

98.     If a lien is attached, plaintiffs will exercise their rights and seek recovery in an amount to be determined by proof, including the costs of transfer.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.      An order declaring that under the Animal Transfer Agreements and applicable law, plaintiffs have the rights to permanent possession of the animals in question;

2.      An order declaring that the Animal Transfer Agreements and applicable law  do not contemplate or allow for a return of the animals rescued from PPI;

3.      An order declaring that PPI is barred from seeking return of the animals;

4.      Quantum meruit recovery according to proof;

5.      Lien recovery according to proof;

6.      Reasonable costs and expenses, including attorneys' fees according to proof at trial; and

7.      Such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs hereby demand a jury trial on all applicable claims.

DATED:  June 25, 2007.

HARRANG LONG GARY RUDNICK P.C.

By _____
       Craig J. Capon, OSB # 98192

SCHIFF HARDIN LLP
Bruce A. Wagman
Robert G. Engel, OSB # 01176

Of Attorneys for Plaintiffs

00177516.DOC;1