William H. Sherlock, OSB #90381
HUTCHINSON, COX, COONS
DUPRIEST, ORR & SHERLOCK, P.C.
777 High Street, Suite 200
Eugene, OR 97401-2782
Telephone:  (541) 686-9160
Facsimile:  (541) 343-8693
Internet E-mail Address: lsherlock@eugene-law.com
Of Attorneys for Defendant

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CHIMPS, INC.; INTERNATIONAL PRIMATE PROTECTION LEAGUE; and MARGUERITE GORDON,<br><br>Plaintiffs,<br><br>v.<br><br>PRIMARILY PRIMATES, INC.,<br><br>Defendant. | Case No. 07-6149-HO<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO CHANGE VENUE** |

## POINTS AND AUTHORITIES

**I.  Plaintiffs failed to prove that the amount in controversy exceeds the jurisdictional minimum of $75,000 because Plaintiffs cannot rationally assert a claim for lifetime maintenance costs of the animals based on temporary custody agreements or conjecture.**

Plaintiffs' Response to Defendant's Motion to Dismiss regarding the amount in controversy relies on mere allegations they made in their Complaint or speculative comments in their Declarations rather than extrinsic verifiable facts.  In order for a federal court to assert diversity jurisdiction over a case, the matter in

1 – DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS OR,
     IN THE ALTERNATIVE, TO CHANGE VENUE

controversy must exceed the sum or value of $75,000, exclusive of interest and costs. 28 U.S.C. §1332(a). When the jurisdictional amount is challenged, the party invoking the jurisdiction of the federal court bears the burden of proving that it does not appear to a legal certainty that the claim is actually for less than the requisite jurisdictional amount. *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 403 (9th Cir. 1996). (The converse is, of course, that the party invoking federal jurisdiction must prove that it appears to a legal certainty that the claim is for more than the jurisdictional amount). If a court is satisfied to a legal certainty that the Plaintiff was never entitled to recover the amount alleged, the suit will be dismissed. *Id*. at 402.

In actions seeking declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation. *Hunt v. Washington State Apple Advertising Commission*, 243 U.S. 333, 347 (1977). However, the administrative costs of compliance with a proposed injunction do not serve to establish that the amount in controversy requirement is satisfied. *In re Ford Motor Co./Citibank*, 264 F.3d 953, 960 (9th Cir. 2001). Additionally, conclusory allegations as to the amount in controversy are insufficient to prove that the minimal amount in controversy is satisfied. *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1091 (9th Cir. 2003).

In *Hunt*, the object of the litigation was the right of individual Washington apple growers and dealers to conduct business in the North Carolina market free from the interference of a statute that prohibited the display of Washington State apple grades on closed containers shipped into North Carolina. 432 U.S. at 333, 347. The Court measured the value of the right by the monetary losses that Washington

dealers and growers would suffer as a result of the statute's enforcement. *Id*. at 347. In holding that the Washington dealers and growers met the minimum amount in controversy, the Court noted that there was evidence that the growers and dealers lost accounts in North Carolina as a direct result of the statute and that growers and dealers incurred substantial costs in complying with the statute. *Id.* at 347-48.

Moreover, the Ninth Circuit does not permit administrative costs associated with compliance with a proposed injunction to satisfy the amount in controversy. *In re Ford Motor Co.*, 264 F.3d at 960. In that case, defendants to a class action seeking, among other things, injunctive relief, argued that the costs of compliance with the proposed injunction established the amount in controversy for diversity purposes. *Id.* at 958. The court concluded that the administrative costs of compliance with the proposed injunction did not serve to establish that the amount in controversy requirement was satisfied. *Id*. at 960. More significantly, the Ninth Circuit noted that its holding would be the same whether the administrative costs of the injunctive relief were incurred due to one Plaintiff or six million Plaintiffs. *Id.* The Court explained its rationale for the administrative cost exclusion:

> "It is fundamentally violative of the principle underlying the jurisdictional amount requirement – to keep small diversity suits out of federal court. If the argument were accepted, and the administrative costs of complying with an injunction were permitted to count as the amount in controversy, then every case, however trivial, against a large company would cross the threshold. It would be an invitation to file state-law nuisance claims in federal court." *Id*. (internal citations omitted).

Here, Plaintiffs assert that each of the three Animal Transfer Agreements (ATA's) separately comprises the value of the objects of litigation. They wrongly assess the purported monetary values of the three ATA's by making extravagant

claims regarding the amount in controversy. For example, Chimps Inc. asserts that their projected expenditure for Emma and Jackson, the two chimpanzees, will be $1,420,800. Likewise, Plaintiffs assert that the value in controversy related to the twelve gibbons is $2,145,000. Finally, they assert that the value in controversy related to the longhorn steer is in excess of $100,000. These numbers and the rationale behind them are flawed for at least three reasons.

First, Plaintiffs are confused as to what constitutes "an amount in controversy" under the statute. Plaintiffs are not seeking to recover the amounts recited in their Declarations from Defendant PPI as damages. They are not saying that these amounts reflect the monetary value of the animals. They cannot say they have expended these amounts. Nor can they point to any monetary consideration in the ATA's. Rather, Plaintiffs try and bootstrap costs that they *may* incur for animal upkeep as an amount in controversy when no such controversy exists. Plaintiffs are not seeking indemnification for those future costs from Defendant. The amount of money required for future animal care has no bearing on who gets custody of the animals -- the real issue in this case.

Their Complaint does include a *quantum meruit* claim for costs incurred transporting and caring for the animals up to the filing of this action, but these amounts are not alleged in any pleading or declaration and most assuredly do not exceed the $75,000 minimum given the animals were transferred within the United States and have been in Plaintiffs' custody for relatively brief periods. Hence, Plaintiffs' so-called "amounts in controversy" are no more than a smokescreen to obscure the fact that Plaintiffs cannot meet the jurisdictional threshold.

Second, Plaintiffs incorrectly allege that the three ATA's are for Plaintiffs' lifetime care of the animals, despite the plain language of the three agreements stating that Plaintiffs contracted only to house the animals on a temporary basis. Rather than tacitly acknowledge this fundamental weakness of their argument Plaintiffs rely on their Declarations in order to assert an unfounded belief that they had a contractual duty to provide lifetime care. Declaration of Paula Muellner in Support of Plaintiffs' Opposition to Motion to Dismiss ("Muellner Dec."), ¶ 5; Declaration of Shirley McGreal in Support of Plaintiffs' Opposition to Motion to Dismiss ("McGreal Dec."), ¶ 4; Declaration of Marguerite Gordon in Support of Plaintiffs' Opposition to Motion to Dismiss ("Gordon Dec."), ¶ 3. Thus, unlike the Plaintiffs in *Hunt*, who submitted evidence that showed the actual value of the loss that dealers and growers experienced due to the North Carolina statute, Plaintiffs merely submitted Declarations asserting the expenditure of monies (rather than a loss) even though these amounts do not flow from the actual contracts in dispute. In other words, the parties to the ATA's did not place any monetary value on the services to be rendered for any time period.

Although Plaintiffs devote a significant portion of their Response trying to establish the actuarial tables for the chimpanzees, the gibbons, and the steer, and then using these life expectancies to estimate the cost of life-time care, each contract states that each Plaintiff agrees to accept custody of the disputed animals on a temporary basis only.

Plaintiffs, however, try and recharacterize the ATA's to suggest that the provisional Receiver for Primarily Primates Inc. (PPI), Lee Theisen-Watt, entered

into ATA's with Chimps Inc. and the other Plaintiffs that "would provide for the lifetime care and sanctuary of Emma and Jackson at its facilities in Bend, Oregon. IPPL and Ms. Gordon entered into similar contracts with respect to the twelve gibbons and a longhorn steer." Response at 2. All three Plaintiffs misleadingly assert in their Declarations that the ATA's they signed with the Receiver conveyed permanent ownership rights over the animals. They did this in order to sustain their unfounded assertion that the amount in controversy exceeds the jurisdictional amount of $75,000 due to the care required for the full life span of the animals.

Plaintiffs' assertion that with respect to the ATA's "the parties to each contract intended a permanent transfer of the animals to Plaintiffs' custody" is patently false. Below is an excerpt from a transcript of the sworn testimony by Lee Theisen-Watt, the PPI receiver who entered into the ATA's with each Plaintiff. The proceeding was held before Honorable Guy Herman, Judge Presiding, held less than a month ago in Austin, Travis County, Texas, on August 29th, 2007. Ms. Theisen-Watt testified as follows:

> Q. All right. Just a couple more questions. You're aware that the Court of Appeals stayed you from permanently transferring any animals in November?
>
> A. Yes.
>
> Q. All right. That order was made aware to you by your attorneys, I assume?
>
> A. Yes.
>
> Q. Okay.
>
> A. That no animals were to be transferred on a permanent basis.

Q. Right. And did you permanently transfer any animals after the date of those court orders?

A. No, I did not.

Q. Did you send two chimps to Chimps Inc. on or about March 12th?

A. Yes.

Q. And was that a permanent transfer?

A. No. it was not.

Q. Is there anything you said to Chimps Inc. that might lead them to believe that that was a permanent transfer?

A. No.

Mr. Parrish: Objection, calls for speculation.

The Court: Overrule the objection.

Mr. Chester: Thank you.

Q. Did you send 12 gibbons to IPPL on or about March 30th?

A. Yes.

Q. And did you say anything to them that might lead them to believe that it was a permanent transfer?

A. No.

Q. Same question about the longhorn steer to Margaret Gordon on or about April 21st. Did you send the longhorn steer?

A. Yes.

Q. Did you mean for that to be a permanent transfer?

A. None of those were permanent.

*See* Declaration of William H. Sherlock, Exhibit A.

It is uncontroverted that during her tenure as Receiver for PPI, Ms. Theisen-Watt worked in concert with People for Ethical Treatment of Animals (PETA), an organization with competing interests from those of PPI and Friends of Animals. Ms. Theisen-Watt relied on PETA volunteers as her assistants during her receivership. After six and a half months the Texas court summarily discharged Ms. Theisen-Watt from her duties after the state Attorney General's office agreed to dismiss allegations of animal neglect against PPI following its investigation of the facility and settlement with the organization. The investigation had been instigated by exaggerated complaints brought by PETA. Thus, the fact that Ms. Theisen-Watt repeatedly testified that none of the transfer agreements she entered into with Plaintiffs were intended to permanently convey ownership of the animals carries significant weight given her undisputed allegiance with Plaintiffs and PETA.

Moreover, Ms. Theisen-Watt's testimony that the ATA's were temporary is consistent with the plain language of the ATA's themselves. Plaintiffs' Response Motion failed to address, much less refute, the fact that the ATA's only contemplate permanent relocation of an animal if one of the parties or the Receiver successfully moves the Texas Probate Court for an such an order.[1] For example, the ATA with Chimps Inc. states "Whereas; Chimps, Inc., has agreed to accept the custody of on [sic] a temporary basis to provide for his immediate temporary care, and upon relief from the Appellate Order and/or approval by the Probate Court, as applicable, to provide permanent care and lifetime sanctuary." *See* Defendant's Memorandum In Support of Motion to Dismiss, Ex. C. Plaintiffs improperly take the last part of this

---

[1]

sentence out of context and try and to make it appear that the ATA was for permanent relocation.

Instead, the ATA makes clear that the relief sought by Plaintiffs, the permanent ownership over the animals in dispute, can only occur if they seek such relief in the specific venue described by the Agreement, namely, the Texas Appellate Court or the Texas Probate Court, both of which already have jurisdiction over this dispute. The first paragraph of the agreement provisions in the ATA's reiterates that: "The Receiver hereby transfers temporary custody, and upon any future relief from the Appellate Order and/or approval by the Probate Court, as applicable, permanent custody, of the chimpanzees known as Emma and Jackson." Similar language is included in the other two ATA's with Plaintiffs IPPL and Gordon. *See* Defendant's Memorandum to Dismiss, Exhibits B and C.

The Appellate Order referred to in the ATA's was issued by the Texas Appellate Court. *See* Declaration of William Sherlock, Exhibit B. Likewise, the Texas Probate Court had overseen the appointment of the Receiver and retains jurisdiction over the PPI settlement with the State of Texas. It has recently issued an order denying the Receiver her petition for costs and attorney fees. Declaration of William Sherlock, Exhibit C. None of the ATA's include any provision for any court other than the Texas Appellate court or Probate court to grant Plaintiff's permanent custody rights. It is undisputed that none of the Plaintiffs nor the Receiver have ever moved either the Texas Appellate court or Texas Probate court for permanent ownership as mandated under the ATA's.

In sum, the ATA's clearly state that the receiver transferred only temporary custody over the animals to the Plaintiffs and that any future grant of permanent custody remains completely dependent on an Order from the Texas Appellate court and/or approval by the Texas Probate Court.[2]

Consequently, the cost of lifetime care is not the correct value to determine whether Plaintiffs meet the jurisdictional minimum. Rather, the correct value is the value of the contractually agreed-upon transportation and temporary care of the animals up to the point when Defendant requested the animals' return to their permanent home in Texas. The animals were transported to Plaintiffs' temporary custody in March, 2007. Four months later, following dismissal of all charges by the Texas Attorney General, Defendant requested the return of the animals to their permanent home. Plaintiff Chimps, Inc. estimates that the cost of one month's care for a single chimpanzee at $1,480. Muellner Dec. ¶ 7. Thus, the cost for Emma's and Jackson's care up to the time that Defendant requested their return is only $11,840. Plaintiff Chimps, Inc. did not submit a monetary value for the cost of transporting Emma and Jackson from their Texas home to Bend. Plaintiff IPPL estimates that the annual cost of caring for twelve gibbons is $165,000. McGreal Dec., ¶ 6. The cost of four months worth of gibbon care is thus $55,000. Plaintiff IPPL did not submit a monetary value for the cost of transporting the gibbons from their Texas home to South Carolina. Marguerite Gordon does not provide any

---

[2] The ATA's make it clear that the Texas Appellate or Probate courts, not a Federal District Court in Oregon, are the only venues for petitioning for permanent custody. Therefore, this Court should refrain from exercising its jurisdiction over this dispute for this reason as well.

10 – DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO CHANGE VENUE

estimate regarding the cost of monthly care for the longhorn steer.  She merely states *"I believed I could be required to*…pay more than $100,000 to transport, care for, feed, and provide medical treatment for the steer….I *assumed* the contract was worth at least $100,000 *to me.*" Gordon Dec., ¶¶5-6.  (Emphasis added).

The other Plaintiffs likewise emphasize their subjective beliefs regarding the value of the contract.  Paula Muellner declares: "[Chimps Inc.] *assumed* the contract was worth at least $1,420,800 to Chimps, Inc." Mueller Dec., ¶ 9. (emphasis added). She further states that: "Based on its dedication to protecting the lives of animals, Chimps, Inc., valued the contract far in excess of $1,420,800."  Muellner Dec., ¶. 9. Similarly, Shirley MeGreal states that "[IPPL] *assumed* the contract was worth at least $2,145,000 to IPPL" and that "IPPL valued the contract far in excess of $2,145,00."  McGreal Dec ¶¶. 8-9. (Emphasis added). Conclusory statements, however, are not permissible for establishing the diversity jurisdictional minimum. Plaintiffs' Declarations assert impermissibly subjective and speculative beliefs regarding the value of the contracts.  There is no Ninth Circuit precedent for a post-litigation party's subjective belief regarding the value of an object.  The subjective beliefs of various Plaintiffs regarding the value of their services that they might incur in the future have no bearing on the actual amount that is in controversy and Plaintiffs' bid for diversity jurisdiction must fail.

Third, even if the Court accepted that Plaintiffs and Defendant agreed that Plaintiffs would provide lifetime care for the disputed animals Plaintiffs would still fail to meet the minimum amount in controversy required for diversity jurisdiction. The Ninth Circuit has held that administrative costs associated with complying

with an injunction do not satisfy the minimum. The rationale behind that holding is a desire to keep small diversity suits out of federal court. If the court permitted the cost of complying with an injunction to count as the amount in controversy, then the federal courts would be flooded with claims. Although Plaintiffs seek declaratory, rather than injunctive relief, the reasoning from *In re Ford Motor Co.* applies equally to this case. If the cost of complying with the declaratory relief that Plaintiffs seek, in this case the cost of permanent custody, can serve to satisfy the minimum amount in controversy test, then many Plaintiffs who would otherwise seek justice in state courts would seek federal jurisdiction.

Finally, Plaintiffs inexplicably assert that if there is any question about their proof, the cost of declaratory relief to Defendant PPI can be considered. Response at 6. Plaintiffs then insist that Defendant PPI has a significant financial stake in declaratory judgment and that this stake should satisfy the jurisdictional amount. *Id*. Yet, Defendant PPI has never asserted a financial stake in a judicial declaration or contractual agreement. Thus, Plaintiffs' confusing assertion is meritless.

In sum, Plaintiffs have failed to offer proof to anything close to a legal certainty that their claims reach the jurisdictional minimum. Their suit should thus be dismissed pursuant to FRCP 12(b)(1) and 12(b)(3).

II. **Plaintiffs have failed to explain why venue is appropriate in Oregon given that a substantial part of the contractual events did not occur in Oregon.**

The only basis for federal subject matter jurisdiction in this case is diversity of citizenship. Hence, the applicable venue statute is 28 U.S.C. § 1391(a)(2). This statute provides that a civil action may be brought in "a judicial district in which a

substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." The overriding principle of § 1391(a) is to further the convenience of the parties. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842 (9th Cir. 1986) (citing *Gardner Engineering Corp. v. Page Engineering Co.*, 484 F.2d 27, 33 (8th Cir. 1973).

  Plaintiffs rely on *Decker Coal* for the general rule that place of performance of a contract provides a proper venue for resolution of disputes because the place of performance is determined at the beginning of contract and parties can anticipate where they may be sued. In addition, the place of performance is likely to have a close nexus with underlying events. While this rule makes sense for contracts generally, it does not make sense in this case. Here, and as explained above, the Temporary Receiver for PPI was granted power to relocate animals only on a non-permanent basis. Furthermore, Chimps Inc. and the other two plaintiffs agreed to accept custody of the animals "on a temporary basis to provide for their immediate and temporary care…." In this case, unlike in *Decker*, the contract was merely for a temporary arrangement. Given the temporary nature of the three contracts, PPI, unlike the defendant in *Decker*, could not reasonably anticipate that it would be haled into a distant court to litigate the issue of permanent versus temporary custody when the ATA's expressly state that permanent custody could only be award by either the Texas appellate or the Texas probate court. Furthermore, while the events underlying a contract are generally likely to have a close nexus with the place of performance, the temporary nature of these contracts, again, show that this case is an exception. The events underlying the contracts all occurred in Texas. PPI

has been working under the supervision of Texas courts to ensure that its facilities are capable of providing a good home for its animals. PPI's historical challenges are key elements of the underlying facts in Plaintiffs' Complaint, and these events all occurred in Texas.

Even if the court determines that a substantial part of events related to Plaintiff Chimps, Inc.'s ATA occurred in Oregon, the fact remains that the Chimps, Inc. ATA is but one of three in dispute. At issue in the Chimps Inc. ATA is the home of two chimps. Anther ATA, not at all related to Oregon, concerns twelve gibbons. Yet another contract, not at all related to Oregon, concerns a longhorn steer. The three ATA's in total comprise the substance of this case. Each ATA must be given equal weight. Thus, Plaintiff Chimps Inc.'s ATA comprises only 1/3 of the events – a fraction that does not rise to the level of a substantial part. If, however, one considers the number of animals at issue, then Plaintiff Chimps, Inc.'s claim must fail even more dramatically. Emma and Jackson are two of fifteen animals and thus constitute a mere 13.3% of the animals at issue. Plaintiffs have utterly failed to refute these facts in their Response.

### III. Transfer of venue is appropriate.

The Federal code at 28 U.S.C. § 1404(a) grants district courts discretion, for the convenience of parties and witnesses, in the interest of justice, to "transfer any civil action to any other district or division where it might have been brought." The Ninth Circuit has long observed that the United States Supreme Court has noted that a Section 1404(a) transfer requires "a lesser showing of inconvenience" than that which had to be shown for a *forum non conveniens* dismissal. *Commodity Futures*

*Trading Commission v. Savage*, 611 F.2d 270, 279, citing *Norwood v. Kirkpatrick*, 349 U.S. 29, 32 (1955). Nevertheless, *forum non conveniens* considerations are useful in deciding a Section 1404(a) motion for transfer. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d at 843. These factors include public and private interest factors. *Id.*, 843 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). Private factors include: "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Decker* at 843 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). Public factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is home with respect to the law that must govern the action; the avoidance of unnecessary problems of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Decker*, 843. Weighing of the factors for and against transfer involves subtle considerations and is best left to the discretion of the trial judge. *Id*.

Plaintiffs have failed to demonstrate why, after applying these factors, venue should not be in Texas. This failure is amplified by the fact that a substantial portion of Plaintiffs' Complaint dwells on the alleged (and inaccurate) descriptions of the PPI facility and its ability to resume caregiver responsibilities. Plaintiff has made clear that it intends to make this issue a major subject of litigation. Access to proof necessary to defend against these allegations is primary located in Texas.

Defendants' witnesses are virtually all Texas residents.  Jury access to the PPI facility should a site visit to the PPI facility appear necessary by the court would be highly unlikely if the matter is heard in Oregon.

Furthermore, as explained above, Texas courts continue to exercise jurisdiction over PPI's process and the temporary transfer of animals and eventual contemplated return of those animals to their PPI home.  Only a Texas court can order permanent custody of the animals to Plaintiffs, as clearly stated in the ATA's, which, by their terms, are to be interpreted under Texas law.  In sum, litigating this action in Oregon makes no sense from a private or public interest perspective.

## CONCLUSION

Plaintiffs' conspicuous failure to address the absence of a contractual amount in controversy combined with their convoluted attempts to distort the intent and plain language of the ATA's to somehow show the monetary amounts in dispute exceed $75,000 reinforces the frivolous nature of their claims and their misguided attempt at forum shopping.  Defendant requests that the Motion to Dismiss be granted, or in the alternative that venue be changed to Texas.

DATED:  September 21, 2007

By: s/William H. Sherlock
William H. Sherlock, OSB #98001
Hutchinson Cox Coons DuPriest
Orr & Sherlock
777 High Street, Ste 200
Eugene, OR 97401
(541) 686 9160
 Attorney for Defendant